Our next case on the call of the docket is agenda number 18. Case number 115-811, Roger Canerva et al. Appellants v. Malcolm Weems. Counsel for the appellant, please proceed. Thank you. Good morning, your honors. May it please the court, I am Edward Kiyonka. Could you speak up, counsel? Am I too loud, your honor? No, thank you. I represent the MAG plaintiffs, but I will argue on behalf of all plaintiffs, the first constitutional issue, the meaning of Article 13, Section 5 of the 1970 Illinois Constitution, sometimes misleadingly referred to as the Pension Protection Clause. Mr. Steven Jokic will address additional issues as time permits. I say misleadingly because in referring to what is protected, Section 5 does not even use the word pension. Section 5 provides that the benefits of membership in a state pension or retirement system are a contractual right, quote, which shall not be diminished or impaired. Now, defendants have attempted to obfuscate and cloud this issue, but the issue could hardly be simpler. What does the word benefits mean? More specifically, does benefits include health insurance? In previous cases, this court has said that Section 5 is plain, and this court has said over and over that if the meaning of a statute is plain and unambiguous, resort to interpretation aides is not necessary or appropriate. The drafters of the 1970 Constitution thought the meaning of Section 5 was plain and so clear that it needed no further elaboration. In the official explanation given to voters concerning the 1970 Constitution, they said, this section is new and self-explanatory. And so it is. The word benefits is a word in common usage. In the employment context, everyone understands what it means. Do an Internet search for job with benefits or ask any person on the street what job with benefits means. Drive down the highway, as we've done, and you'll see signs that say, now hiring job with benefits. Everyone knows that means such things as health insurance. In the dictionary we cited in our brief, benefits is defined to include such things as health insurance. But the best source of Section 5's meaning is the understanding of the voters who voted for the Constitution. Common sense tells us that voters would have understood the term benefits to include such things as health insurance. Focusing on the text of Section 5, by choosing the term benefits, the drafters chose to protect not just pensions, but all benefits of membership in a pension or retirement system. There would be no reason to use the term benefits if only pensions were to be protected. Looking beyond the text to the title of Section 5, we further find confirmation that benefits means more than just a pension. The title is pension and retirement rights. If Section 5 were intended to be limited to the pension alone, the word retirement would be superfluous. And this Court has said over and over that no word should be, we should not assume that any word in the statute is used needlessly. So benefits have to include more than just a pension. Defendants have tried to argue and distract attention from this simple issue by arguing such things as the General Assembly's statutory classification which divides retirement benefits between two different statutes, the pension code and the insurer's code. They argue that only the pension code benefits are protected. But the arbitrary location of a statute in the codification scheme of the Illinois statutes cannot dictate the interpretation of the Constitution. We have to look to Section 5, and Section 5 makes no such distinction. Section 5 says nothing about the source of the benefits that are protected. Would this be the first time, in your favor, that Article 8, Section 5 has been applied to a benefit that was not codified in the pension code? This is the first time that a case has arisen which did not involve a pension. But, of course, there's always a case of first impression, Your Honor. But this is a case of first impression because no prior case has involved anything other than an attempt to diminish pensions. And if we did that, would that expand the scope of this clause, and would that make a difference if it did? No, Your Honor, it doesn't expand the scope of the clause because the word that the drafters chose, the word that the voters voted on was the word benefits and not pensions. And so the term benefits is much broader than pensions. And so we're not really expanding anything if we now define benefits to include health insurance. Basically, there are only, as far as I know, I'm a member of the class, there are only two benefits for us as retirees, pension and health insurance. Yes, my question, Mr. Vonnegut, is, is there any difference between the meaning of pension system and retirement system? Your Honor, in the statutes there are, in the pension code, there are multiple articles that have different retirement systems. Some of them are called pensions, pension fund. Some of them are called retirement system. What is it? Is there a difference between the two? No, Your Honor. So the pension system really is a retirement system? These cases that, there are four consolidated cases here, deal with the five retirement systems because that's what's affected by public act, the public act in question, 97-695. So that's the only issue before the court. Retirement system. Yes, right. The five retirement systems, which are the general assembly retirement system, the state employee's retirement system, the state university retirement system, the teacher's retirement system, and the judge's retirement system. And those are what are affected by this act. And all we are asking with respect to this statute is to roll back to what it was prior to the enactment of 97-695 because that enactment is unconstitutional as applied to the health insurance benefit, which retirees, workers and retirees have relied on. The purpose of this statute is self-evident, to prevent the general assembly from doing what it tried to do in this statute, break the promises made to public employees and retirees, promises that they relied on in accepting and continuing their employment, benefits that are part of their compensation package, benefits that were earned and paid for. As documented in our briefs, the state has long treated health insurance as one of the benefits associated with retirement under the state's retirement system. Is it your position that the benefit packages, publications were made available to employees during their active employment or only at the time of retirement? No, Your Honor, I think the record shows they were made available continuously to employees during their employment. Are we talking about the system that provides retirement income? Income, the word income. Are health insurance benefits income? Well, I don't think that they would be strictly defined as income, but they're a form of compensation, Your Honor. But does the statute talk about a system that provides retirement income? No, Your Honor, because we're construing Section 5 of the statute, and the statute says benefits, which is a much broader term than income. The Constitutional Convention, the voters who voted for this, chose to protect benefits, not pension income or any other kind of income. They chose to protect pension benefits. Is there a difference between benefits and accrued benefits? No, not in our case. There are, in the other cases that we've cited, the Duncan and Everson case, and in two of those three cases where this issue has come up in other jurisdictions, the constitutional provision was almost identical except it used the term accrued benefits, and that was to allow the legislature to change unvested benefits. But this Court has already held, we've cited the cases in our briefs, and this Court has held repeatedly that these benefits best when you accept and begin your employment with the state. And what about the clause protects the benefit of membership, the pensioner retirement system? Is there a difference between protecting the benefits of membership and pension benefits? Your Honor, membership in the system is a condition of receiving these benefits, so they are linked. That is the, in order for me to have health insurance as a retiree, I have to be a member of the retirement system. So as we've shown in our brief in detail, these benefits are all linked to the retirement system or pension system, as the case may be. Well, Mr. Kiyanka, you had indicated that they would vest at the time of employment, but if you hang your hat on the Section 5 that refers to membership in a pension or retirement system, isn't there a period of time, X number of years, before an employee vests in their right to a pension, their right to a retirement, like six years, eight years, whatever it may be? Yes. Yes, Your Honor. So earlier when you responded to Justice Freeman about rolling it back to the time period before the enactment of 97-695, is that the critical date, or is it the date of when the contract was performed between the State and the employee? Well, Your Honor, the class that we're dealing with are people who have vested benefits under this. You may become a member on employment, but not be entitled to a particular benefit until you've satisfied a certain amount of time. But you're still a member of the system. And the point is you are locked into whatever benefits were part of the compensation package that was your package at the time your employment began. Does that mean that if the benefits increase later on, you're not locked into those? Well, Your Honor, that issue has come up in some other cases, and they've said that benefits can be increased, they can't be diminished. But in today's climate, I can hardly believe that benefits are going to be increased in the future. The movement is all going to be the other way. Does the record indicate that there were benefits that have changed over the period of time during which some of the plaintiffs here would have been employees? I don't think the record is clear on that, Your Honor, but I think the class definitions will take care of that. The class definitions are people who were adversely affected by 97-695. And so that automatically includes only those people who had these vested benefits and whose benefit was, in fact, reduced. Could the state, under your argument, provide bare-bones coverage as long as it paid 100 percent for people that were employed longer than 20 years? Your Honor, that's another question. This is about premiums. This Public Act 97-695 is about requiring us to pay premiums that we didn't have to pay before. The flip side of that is could they change benefits? And I think that question would require more research and briefing in order to answer that authoritatively. So I don't want to make a commitment on that at this point. But it seems to me that logically, if there were a substantial diminution of benefits, that that would also be a violation of Section 5. Now, I would assume that certain kinds of insurance coverages can be modified and so forth, as long as they're not substantial changes. But a substantial reduction in coverage benefits would also violate Section 5. But I think that issue is not particularly raised in this case. Thank you. If I have no other questions, I'll yield the rest of my time to Mr. Jokic. Actually, your time expired, so there's nothing to yield. Oh, I didn't know there were times separately, Your Honor. Thank you. May it please the Court. My name is Stephen Jokic. And I came into this case as the representative of what we call the Bauer plaintiffs. The Bauer plaintiffs are a group of individuals that belong to various different unions during their employment, some of whom were covered by collective bargaining agreements that dealt specifically with the issue of what benefits they would have when they retired from employment with the state. And the complaint that was filed in the Bauer case pleads that prior to 1998, all state retirees who were vested in the various retirement systems received free individual health insurance coverage at no cost. The complaint further pleads that in 1998, there was an integrated statute passed, which increased the pensions of public employees in the state and put into effect what we call in the briefs the sliding scale of insurance, where you accrue the amount of premium that's paid by accruing service within the state retirement system. And at the same time, that statute was put into effect. In the main agreement between AFSCME Council 31 and the state of Illinois, the language of the statute was incorporated into that main agreement. And most of the plaintiffs in the Bauer case are people that retired under various collective bargaining agreements that had in them this guarantee of benefits during their retirement. What I'd like to do is talk some about the collective bargaining implications of their situation. I'd like to talk some about the statute and the statutory rights that people have in Article I, Section 16 of the Illinois Constitution, which protects against the impairment of contracts. And finally, if I have time, which I'm not sure I'm going to have, I'd like to touch on the promissory estoppel claims that are made in the Kenerva case. So with respect to collective bargaining, the Bauer plaintiffs who were covered by these state master contracts retired under contracts that said during your retirement you will get certain health insurance coverage. And it is our position that those contracts can be enforced by these individuals in the circuit courts of this state under Section 16 of the Public Labor Relations Act, which gives the circuit courts general jurisdiction to deal with contracts that are made by public employers and public employees. And if you read the language of Section 16 and you compare it to the language of the federal statute that did the same thing for the federal courts in the 1940s, they're very specific because they talk about giving general jurisdiction to hear contract claims between the parties to contracts. And the language in Section 16 is a little bit different than the language in Section 301, but if you compare the syntax of the sentences, it's clear that both sections had the same purpose, and that was to say in the area of collective bargaining agreements, courts have jurisdiction to hear the claims that people have. And so our position in this case is that as third-party beneficiaries of those agreements, retirees can come to circuit court and enforce the rights that they had under the contracts that were in effect when they came into retirement. Now, the circuit court and the state have a different view. They have contended that there is a specific sentence in Section 16 that refers to enforcing the contracts between parties, and that even though they are called third-party beneficiaries, retirees do not have the ability to come to court and enforce their rights, and that instead, at best, they might have the right to go to the Illinois Court of Claims. And we think that that distinction is not one that's supported by the language or the precedent of the statute or the cases that have interpreted the statute in similar statutes. And we cover extensively in our brief the federal cases dealing with Section 301. Our brief has an interesting case from the Texas Supreme Court in it that dealt with very similar language where the court came to the common-sense conclusion that if you are a third-party beneficiary, that that is sufficient to bring you into the coverage of a statute that says the parties to a labor agreement can come to court and enforce that labor agreement. And if you were to hold otherwise, you would really put state retirees into a separate category than all other retirees. Our brief cites a number of cases from other courts involving retirees of other jurisdictions, the Dell v. City of Streeter case, the Hockey case, and the Marconi case. And in those cases, public retirees were able to come to circuit court to enforce their rights. Under the analysis that's proffered by the Attorney General and that was adopted by the circuit court below, you could only go to the Court of Claims to enforce those rights. And we think that's not what they meant when they wrote Section 16. It's not what they meant when they wrote Section 25 of the Labor Act that says the state of Illinois waives sovereign immunity under the Labor Act. And so we think that on that point alone, the circuit court should be reversed. Now, even if you were to reject that argument, though, the retirees would have a valid claim constitutionally under Article I, Section 16 of the Illinois Constitution because they would have a claim that Public Act 97-695 impaired their collective bargaining agreements because the defense of the state to a breach of contract claim would be that the statute allows us to do what we're doing. And under the definition of impairment that was proffered by the Attorney General in their brief, i.e., the elimination of a remedy for breach of contract, that is a classic definition of impairment. The Attorney General concedes in the brief that it is possible to create a vested right with respect to a retirement benefit such as insurance. And they concede that in an appropriate case, there might be an impairment. This is the appropriate case because the statute in question has completely removed the remedy that a retiree would seek if they went to court wherever, court of claims, circuit court, in order to vindicate their rights. And so in addition to the collective bargaining argument, the plaintiffs who retired under these various collective bargaining agreements have a constitutional claim. Now, there's a group of plaintiffs in the Bauer case that were not covered by health insurance clauses in their collective bargaining agreements. And they are like the rest of the retirees in these cases because they don't have specific contract language to protect them. And the issue that you will have to resolve in that case is whether these retirees have a vested right that is protected by statute. And I think that this statute is all of the earmarks of what a vested right is. It's something that you get by accruing service. In other words, you get more if you have 16 years than if you have 10 years. And you get more if you have 20 years than if you have 16 years. Number two, it is a statute that relates to what we call deferred compensation. And in our briefs, we do a long summary of the Illinois law with respect to deferred compensation. And we point out how the courts of this state have consistently protected compensation that is earned at one time and supposed to be paid at another. And thirdly, if you look at the policy with respect to the retirement clause of the state constitution, the policy is to protect people who can no longer go back to the labor force. Retirement promises are special because you work for them over the course of a career and because you can't do anything when they're broken. You can't go back to state employment because you've retired. And it's those expectations that are sort of the essential aspects of what a vested right is. And so we think that there's a statutory claim there as well. If some promises made by administrative officials can be binding on the legislature's power to change the law, on what basis do you draw a line between binding promises and non-binding promises? Well, I think this case is unique because what we rely on for the binding promise is the sliding scale statute, where the General Assembly said this is a benefit that members of the state retirement system are going to receive. And so it's not a case where you had some functionary in the Department of Central Management Services make a promise out at some meeting in the suburbs that, of course, your retirement will be taken care of. Rather, it's a promise that the General Assembly made when they did the pension bill in 1998, that we're going to increase pension benefits, we're going to make insurance less than free for a group of people. But on the other hand, if you get your 20 years in, then you'll have your free insurance. And so I think that's a legitimate point, but not for this case, Your Honor. The benefit books state that the terms are, quote, legally enforceable, but it's also claimed the state can unilaterally change the terms at any time. If that is true, then how are the terms enforceable? Well, you have to be very careful as to what you're referring to and which benefit book. The benefit books that were in existence, that were attached to the complaint, that formed the basis of where we are today in this cause of action, had no reservations with respect to the payment of premiums. And they contained no language that said we can change the premiums at any time, we can impose different premiums, et cetera. Now, they might have had language that talked about whether or not you can have a certain procedure covered, what your coinsurance could be, what your deductible might be. Those might be alterable under the terms of those plan documents. But those plan documents contain no reservations or rights with respect to the payment of premiums, and that's what we rely on in this case. If there's no further questions, your time has expired. Thank you, Your Honor. May it please the Court, I'm Assistant Attorney General Richard Huzzack, Counsel for the State Defendants, CMS Director Malcolm Weems, and the other defendants in this case. And I urge the Court to affirm the Circuit Court's dismissal of these actions and the claims included in them. Most of those issues, I think, are fully and fairly addressed in our brief. I'd like to focus, if I may, unless there are any questions on any of the other claims, on what I consider to be the core claims in this case, which relate to the plaintiff's arguments that provisions of the Group Insurance Act constituted a statute that was not just like any other statute. It could be changed by the legislature if it sought, if it believed that a policy change was warranted. But were vested contractual rights established by a statute that the legislature could not constitutionally change. I do want to have maybe 30 seconds or a minute at the very end to address the collective bargaining agreement, impairment versus breach issues. But most of my time I'd like to devote to this vested contractual status to this statute argument. They insist that the latest act here, Public Act 97-695, is unconstitutional because it repealed, in particular, the sliding scale provision of the Group Insurance Act that they say constituted a vested contractual right that had a contractual status. Now, the plaintiffs made two legal arguments. They invoked two provisions of the Illinois Constitution in support of the theory that this statute had a contractual status. And in their reply briefs and in their oral argument, they have not focused on the contracts clause. But I'd like to just address that for a minute because I think it's helpful to frame the proper analysis. And the beginning point for that analysis is the strong presumption that contracts are presumed not to establish contracts, but merely statutes are intended to establish a policy that the legislator can change. And there's strong policy reasons for that presumption, which is that the legislature's principal job is to pass laws, not to make contracts. And there is, accordingly, a narrow exception to that if the legislature states with unmistakable clarity that it intends to create contractual rights. The reason for that test, which has a great virtue, is that we don't want, by inadvertence, the legislature to be told later that they've stumbled backwards into some massive contractual financial liability that binds future legislatures. So that's the concept. There is, of course, a great temptation always to insist that a statute isn't just a statute, that it creates a contract. But the virtue of that test of unmistakable clarity is to prevent there from being uncertainty, and so that when the legislature acts, it can know with confidence whether it has created a contract or not. A similar factor or policy should inform the Court's analysis with respect to the Pension Protection Clause, to which I'm going to turn in a minute. But looking at the provisions of the Group Insurance Act alleged to be a contract, there is, in fact, nothing in the Group Insurance Act that satisfies that strict standard to establish a contractual status for those provisions. There's nothing in the language of the statute that says we intend these to be contracts, we intend the legislature not to have the right to change the premium payments to current employees or retirees in the future. In fact, the irony of this case is that they are insisting that the sliding scale, which was enacted in 1997, has a contractual status when not only had the General Assembly previously, on multiple times, amended the Group Insurance Act to reduce benefits, and those are laid out in our brief, but also the sliding scale itself increased the benefits for anybody who did not have 20 years of service. So it's somewhat ironic to say that the General Assembly, when it was reducing benefits for health insurance for the third or fourth time, intended those somehow to be contractual and not subject to further reduction. And I think the nail in the coffin of that argument is that Public Act 97-695 itself recognized that there was a provision that was added to the Group Insurance Act at the same time that there was a correlative provision in the pension code that said some limited number of SURS members can make a specific election, which itself was contractual, to be exempt from the sliding scale contribution requirements, but then give up pension rights in exchange for that. They knew how to make a contract when they wanted to make a contract, and they have done so, and there's nothing in the Group Insurance Act that indicates that they wanted to do so with any of the provisions that the plaintiffs invoke here. Right now, the required contributions, as the law stands, for retirees is relatively low. But under your argument, just so I understand, a decision in your favor by this court would mean that retirees could be required to pay substantially more at a later point in time, or the retiree health care could be abolished entirely, right? There's nothing to say that that could not be done. Correct. As a constitutional matter, that is true. It's sort of like the U.S. Supreme Court having said in the 1950s that Social Security doesn't have a contractual status. Now, are they going to rush to abolish Social Security next week despite the, you know, long-term projections of financial problems for the federal government? I don't think so. There's a political process that the legislature goes through when they decide what they're going to impose in terms of statutory rights, obligations, and benefits. But as a constitutional matter, that is correct. Is there any recourse that you can see for someone who took early retirement, sat down and there was a seminar put on by the state in which they were told that they would have free health care, and then the state takes away? I mean, that's why I went with the example of even taking away the health care. Presumably, that retirement decision was made with the fact that they didn't have to pay for the health care at the time they made it. Any recourse? I think there is not in the sense that they would have a constitutional right. The early retirement incentive statute said nothing about medical insurance benefits. It said that you could buy service credits in your pension system. It didn't say that there was anything that was guaranteeing that the current state of state contributions to health insurance was immutable or couldn't be changed in the future. There were representations made that reflected what the status of the law was at that time. Our position, and I don't want it to sound hard-hearted, is that those statements about the state of the law at the time are not fairly characterized as promises that the General Assembly could not change the law or would not change the law. To the extent that there was a statutory bargain laid out in the early retirement incentive program, that's contractual and that is being honored. But the idea that statements about how the service credits that were bought would play into the then, in effect, state of the law regarding medical benefits was never a promise. So I would say that there wouldn't be a remedy because there was no right. And I've addressed, I think, in fair length, the notion that there's some type of enforceable promissory estoppel theory, either of constitutional magnitude or under common law principles for that. That said, I do want to emphasize that at the current time, the General Assembly has kept to a very low level the additional contributions made by people who are retirees who, whether their reliance was reasonable or not, nonetheless, I think we're hoping it, at least, that their medical insurance contribution levels wouldn't go up massively. If you get a $50,000 a year pension and you're Medicare eligible, you're paying about $41 a month now, and that's going to go up next year, July 1st, to like $82 a month for a benefit for the individual that costs the state approximately $5,000. So, you know, there's sort of fairness both ways, and I think the legislature has addressed that in a constitutional way. And I would sense from your earlier argument that you would suggest that the Hawaii court just got it wrong. We do suggest that the Hawaii court got it completely wrong. And that, I think, is they seized upon this notion that the language of that Constitution can somehow be, you know, pulled apart, spun around, thrown into the blender and pasted back together so that you get the idea that benefits can be read in the abstract, and all that is required is that some statute somewhere promised some benefit to somebody conditioned upon their being a member of a retirement system. That's not the language of our Constitution. But you would dispute that we would be dealing, the Hawaii court was dealing with a nearly identical pension clause and nearly identical statutes. Hawaii? Yeah. No, their system was entirely different. Yes, I'm sorry. Hawaii was like Illinois because it was outside the pension code that they found this benefit created under a totally different statute, which I think harkens back to Justice Freeman's question, which is, is this a case of first impression in which somebody is arguing that some type of statutory benefit outside the pension code falls within the interpretation of the pension clause for purposes of giving it a contractual status? And I think our position is simply the Hawaii court got it wrong. You can't take member and separate that from the language of the clause itself, which says, and I think it's important to focus on the language, membership in a pension or retirement system of the state shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired. Justice Garmon, again, asked what's the importance of the phrasing membership in. If I tell somebody that membership in the state employee's retirement system is a contractual relationship, they understand what that means. Those are the benefits intrinsic to that retirement system vis-a-vis them as a member and the retirement system, which has its separate board, pays pension benefits out of the segregated funds of that system. That's clear to them. They don't think that you can somehow sort of slice and dice that language, take the word benefits out of it, and say, well, anything that's a benefit to any person who happens to be a member of that system, regardless of whether it's in the pension code, now somehow acquires a contractually or constitutionally enforceable contractual status. What the plaintiffs are asking this Court to do is to give the pension clause a new and expansive interpretation. This is essentially trying to put a square peg into a round hole. The meaning of the clause, based upon the constitutional convention debates and the text of the clause and almost four decades of uniform jurisprudence by this Court, has established that it was intended to overturn the noncontractual status of public pension systems in which participation was mandatory. And there were a couple of systems where it was voluntary. The Court had said even before 1970, those are contractual. The purpose of the clause was to say all of the pension and retirement systems. And hearkening to Justice Burke's concept, I think there's a concession here that pension and retirement system all mean the same thing. They're the pension and retirement systems that are included in the pension code. That code was codified before 1970. They all mean the same thing. And that the purpose was to make all of those systems tantamount to being voluntary in the sense that the pension rights prescribed by the terms of the relevant governing article of the pension code now became contractual and enforceable. And the Court has hewed to that principle. It has reinforced it. It has said that the pension rights are defined by the pension code. Those are what are subject to protection against being diminished or impaired. And you cannot simply take out of the clause itself. You can't ignore that history. You can't ignore the text. And you can't set aside that long constitutional jurisprudence by this Court and say, well, now let's give it a great new, you know, brand-new interpretation because we would like these benefits that are provided outside the pension code, that aren't pension benefits, that aren't paid for by any of the pension systems, that aren't administered by any of those pensions. We'd love those to have a contractual status. I want to remind the Court, if the legislature wants to create a contractual status for medical health insurance benefits for current employees or retired employees, they have the constitutional power to do so, but they need to do so explicitly and clearly. And in this case, the plaintiffs are saying, well, the legislature may not have intended to do that, but let's just accomplish the same result by giving this new expansive interpretation to the pension clause. And I think that can't be squared with the language of the clause. It can't be squared with its clear historical purpose. And it can't be squared with the many cases where this Court has interpreted the clause. The differences between the two types of systems reminds me of the old adage that if something, you know, looks like a duck and walks like a duck and quacks like a duck, it must be a duck. Well, for pension benefits administered by a pension system under the pension code, that's a fair observation. But what we have here is something where we're not talking about pension benefits, we're not talking about something that's governed by the pension code, and it's not paid for out of funds of any of the pension or retirement systems that are in the pension code. So I suppose the corollary to that observation is if it doesn't walk like a duck and it doesn't look like a duck and quack like a duck, maybe it's not a duck. And I think here the plaintiffs hope that the Court will find that they can shoehorn this benefit, the statutory benefit they want, into a contractual status by expanding the scope of the pension clause, I think falls upon those many principles. Now, Justice Freeman had asked, is this the first case in which a benefit would be considered to arise outside the scope of the pension code? The answer to that is yes. There are amicus briefs before the Court that argue that there was some provision for paying some of the cost of the premiums of a medical insurance program for City of Chicago employees. I don't know the intricate history of that, but that's a situation in which there was some reference in the pension code itself to something that has some connection to medical insurance benefits. What I want to tell the Court today is that that issue is not before the Court. It should not decide that issue. Our position is clear, I think, as to what the meaning of the pension clause has always been. But we don't want to take a position, nor do we want the Court to adjudicate claims that are not properly before it on an adversarial basis that are going to be the subject, apparently, of other litigation that may well wind up here. The clause uses the phrase pension or retirement system. What's the difference? There really, I don't think, is any. Many of the pension systems when the Constitution was adopted were referred to as pension systems. Many of them were referred to retirement systems. Some were referred to as pension funds. Some of them were referred to as annuity funds. They were all essentially the same thing. They granted pension benefits. Medical insurance benefits were not even in anybody's contemplation at the time. And I believe the answer is that they were both intended to have the same meaning. Now, there was a suggestion that the word benefits was used and not pension benefits. But that's partly just a recognition that what we traditionally define as pension benefits that are promised by pension systems as opposed to regular employment benefits like medical insurance sometimes include payments to a widow or payments to minor dependents upon the death of a member who does have no spouse. So there are occasionally benefits that are not in the nature of annuities, but they all fall into the same category of a substitution for income when the person stops working. That's completely different from the type of insurance program that qualifies as a benefit generally. So I don't think that any special significance can be attached to the constitutional use of the phrase benefits to the point that it would encompass anything that somebody could call as a benefit, especially when you consider the rest of the context in which the statute was written. The other arguments to try and interpret the clause in an expansive and favorable way suggest that maybe the Group Insurance Act is a retirement system. I don't think that's a tenable interpretation of the Constitution or what the legislature intended when it passed the Group Insurance Act. There's a suggestion that benefits can be contingent upon membership and that's enough to make them a benefit of membership in a retirement system. I think our position is clearly that's not what was intended. The plain language of the clause, following its historical purpose, was to take the contractual relationship or to create a contractual relationship out of the intrinsic aspects of the rights and obligations of the retirement system or the pension system vis-a-vis the member and take them away from the status of non-contractual because that created the great insecurity by the people at the time. There are, and I don't want to spend too much time on it, there was a question about vesting by the Chief Justice. There are all sorts of different definitions of vesting. Vesting can be when you're entitled to actually receive an annuity under the pension system. It can be the constitutional definition of when actually you're entitled to the protection of the Constitution. It can be the contractual meaning with respect to vesting that the Bauer plaintiffs are proposing. So in this sense, the notion of vested contractual status that we're using is a constitutional contractual protection for the statute. It used to be that you had to be a state employee for six months before you got that status under the new statute. Now you get that immediately when you're an employee. But essentially membership and vesting go hand in hand. We don't dispute that. Justice Carmeier had asked about the history of changes in the Group Insurance Act. I hope that I've adequately addressed that and pointed out that there have been multiple, multiple reductions, including before the sliding scale was enacted, that tended to, I think, unmistakably reflect an intention by the General Assembly that that statute not create any contractually protected rights. So if I have, subject to any questions the Court may have, I'd like if I may take 15 seconds or 30 seconds with respect to the impairment versus breach issue on the Bauer plaintiffs. Fifteen seconds would be great. Okay, all right. The reply brief says that the state essentially has taken the position that the new statute nullifies any obligation, negates any liability, precludes them from any recovery whatsoever, and therefore it's an impairment, not a breach. The answer to that is that's completely wrong. That's not correct. The state's position is if their interpretation of the contract is correct, which we dispute, but if that were upheld and decreed to be the correct interpretation of the contract, the new statute may require the state to act in a manner different from those obligations. That's non-performance. But the statute does not nullify those obligations, declare them to be nugatory, say that there shall be no recovery or no damages in any court of competent jurisdiction. It's just a breach, not an impairment. Unless the Court has any other questions, I urge you to affirm the Circuit Court's judgment dismissing these actions and the claims within them. Thank you, Your Honors. Thank you. We've got about 30 seconds there. So I'd like to hit a couple of the high points. One point that I think the Court should stay in mind, keep in mind, is I don't think it's right to say that there was a history of constant change in the Group Insurance Act prior to 1998. If you trace the history of the Group Insurance Act, and both briefs do this, you'll find that up until 1991, it was always clear that the coverage for individuals, for retirees, was free. There was a period of time when there were some statutory changes. But during the time that the changes were in effect, there's a concession by the Attorney General, and it's applied in our complaint, that no retiree was ever charged. So 1998 comes along, and in 1998 they started charging people. But they charged people in the context of improvements to their pensions. And pretty much, if you go back and look and weigh the charges for insurance versus the improvements in pensions, almost everybody was better off. And so in the context of the whole package of retirement and pensions, there was no diminishment or impairment of anybody's rights of membership. Now, I think there's an important point here, and that is that there were a few people who could rationally say, you know, I'd be better off getting free insurance and having the old pension than being charged for my insurance and having the new pension. People with less than 20 years of service. And that's why the General Assembly enacted a specific statute that says you can opt out of the new pension. And that was intended to allow people to keep their free insurance. And those people who opted out of the new pension, who were supposed to be able to keep their free insurance, are now being charged under the rules that CMS is promulgating. So those people relied on this expressed vesting and are now being charged by the Director of CMS for their benefits. And I think that statutory history supports our position much more than it supports the state's position. So I think what you need to do is observe that both the plaintiffs and the defendants agree that in the normal course, a statute doesn't create a contract. It doesn't create a vested right. And that's, for better or for worse, that's the rule of law. The constitutional provision, Article 5, Section 13, says retirement is different than that. When it comes to the pension code, if you've got a right under the pension code, and it's a right of membership in the system, even if the General Assembly doesn't say we really mean it or we really meant for this to be vested, it's a right that can't be diminished or impaired. But you have to go one step further and say, well, why did the General Assembly do that? Well, they did it because retirement is special. Retirement is special because you work for years and years and years before you get to retirement. Retirement is special because the benefit you get is deferred compensation. Retirement is special because in the main, once you're retired, you can't go back and earn some more service or earn some more money because the state's decided to decrease your pension. And so if you look at why we have that constitutional provision, what's the policy? Does that policy apply to what we're dealing with here, which is the creation of a system of insurance? Now, granted, there are differences between the pension code and the Group Insurance Act. But if you were the General Assembly and you wanted to create a retirement insurance benefit, it would be foolish to do that inside of the pension code, because you've got a system out there like the State Group Insurance Act that has a ton of people in it, that has enormous leverage with providers, and which already is set up. And so we think that in 1998, when the General Assembly created the sliding scale in the present system, they didn't know what it was doing. It was creating a retirement benefit, a retirement benefit that people could rely on. And it did that by modeling the retirement benefit after a pension benefit, i.e., as you work, you get more of it, and by hooking it into your status as a member in the system. And as a consequence, to come back now 15 years later and say, well, the General Assembly didn't say we really meant it when they did it, I think they did really mean it, because that's the way they created the benefit. Now, I think Justice Thomas' observation is an important one, and that is that under this statute, you can make a retired member pay the whole $5,000. And under this statute, that would be a disaster for most state retirees, because that would eat up probably a good third, a good 25% of your pension. And if you look at the statutory right that the director of DCMS has under this statute, it's hard to conclude that anything other than the director of DCMS has the power to completely nullify the retirement benefits that state retirees have worked for and relied on for many years. When you think about retirement, and I've gotten to be in a position where I've had to do that, you think about two things. You think about what money is going to come in and what am I going to do if I get sick. And you think about that, whether you make $100,000 a year or whether you make $30,000 a year. And what the state's position is is that, you know, we agreed to it in a contract. We put it in a statute. We hooked it up to pension. We let you accrue it all over time. The state's position is forget about it. We don't have to pay attention to that anymore. We can get rid of it. And we think that's contrary to the policy of the Constitution with respect to pensions. It's contrary to the policy of the Constitution with respect to impermanent contracts. It's contrary to the successive collective bargaining agreements that the state has entered into with representatives of people who are planning their retirement around their kitchen tables. Now, in the last 15 seconds of the Attorney General's argument, they said, well, the statute doesn't nullify anything. And au contraire is all I can say because it's my understanding that their position is that a complete defense to a contract claim is that we have this law that we can rely on. People have already worked for these benefits, and now they can be taken away. I don't know what anything that that can be besides a classic impairment of contract. And if it is an impairment of contract, then this case has to go back to the lower court because there are a lot of issues that the lower court never got to on that issue. And even though I have a couple minutes left, I'm standing between a lot of people and lunch, so unless the panel has any questions, I'll be happy to close. Thank you. Case number 115811, Roger Canerba, et al. Appellants v. Malcolm Weems, et al. Appellees has taken our advisements. Agenda number 18, Mr. Kiyanka, Mr. Jokic, Mr. Huzzack, thank you for your arguments today.